## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| **ERIC JOSEPH BURAS** | **CIVIL ACTION** |
| **VERSUS** | **NO. 14-2963** |
| **N. BURL CAIN** | **SECTION: "H"(1)** |

### REPORT AND RECOMMENDATION

This matter was referred to this United States Magistrate Judge for the purpose of conducting a hearing, including an evidentiary hearing, if necessary, and submission of proposed findings of fact and recommendations for disposition pursuant to 28 U.S.C. § 636(b)(1)(B) and (C) and, as applicable, Rule 8(b) of the Rules Governing Section 2254 Cases in the United States District Courts. Upon review of the record, the Court has determined that this matter can be disposed of without an evidentiary hearing. See 28 U.S.C. § 2254(e)(2). Therefore, for all of the following reasons, **IT IS RECOMMENDED** that the petition be **DISMISSED WITH PREJUDICE**.

Petitioner, Eric Joseph Buras, is a state prisoner incarcerated at the Louisiana State Penitentiary in Angola, Louisiana. On September 28, 2009, he pleaded guilty to second degree murder under Louisiana law.[1] On October 26, 2009, he was sentenced to a term of life imprisonment without benefit of probation, parole, or suspension of sentence.[2] On October 29,

---

[1] State Rec., Vol. 4 of 8, transcript of September 28, 2009; State Rec., Vol. 1 of 8, minute entry dated September 28, 2009.
[2] State Rec., Vol. 4 of 8, transcript of October 26, 2009; State Rec., Vol. 1 of 8, minute entry dated October 26, 2009.

2010, the Louisiana First Circuit Court of Appeal affirmed his conviction and sentence.[3]   His related writ application was then denied by the Louisiana Supreme Court on November 14, 2011.[4]

On November 14, 2012, petitioner submitted a post-conviction application to the state district court.[5]   However, on December 7, 2012, the court notified petitioner that the application would not be considered because it was not notarized.[6]   Petitioner then resubmitted a notarized copy of his application on December 18, 2012.[7]   That application was denied on May 30, 2013.[8] His related writ applications were then likewise denied by the Louisiana First Circuit Court of Appeal on December 9, 2013,[9] and by the Louisiana Supreme Court on September 26, 2014.[10]

On December 21, 2014, petitioner filed the instant federal application seeking habeas corpus relief.[11]   The state filed a response arguing both that petitioner's application is untimely and that his claims fail on the merits.[12]   Petitioner has filed a reply to the state's response.[13]

---

[3] State v. Buras, No. 2010 KA 0669, 2010 WL 4272876 (La. App. 1st Cir. Oct. 29, 2006); State Rec., Vol. 5 of 8.

[4] State v. Buras, 56 So.3d 465 (La. 2011); State Rec., Vol. 5 of 8.

[5] State Rec., Vol. 5 of 8.  Federal habeas courts must apply Louisiana's "mailbox rule" when determining the filing date of a Louisiana state court filing, and therefore such a document is considered "filed" as of the moment the prisoner "placed it in the prison mail system."   Causey v. Cain, 450 F.3d 601, 607 (5th Cir. 2006).  That date cannot be determined with certainty with respect to this filing; however, the Court will assume for the purposes of this decision that petitioner placed the application in the prison mail system on the date he signed the accompanying memorandum, i.e. November 14, 2012.

[6] State Rec., Vol. 5 of 8, Letter to petitioner from Judge William J. Crain dated December 7, 2012.

[7] State Rec., Vol. 6 of 8.

[8] State Rec., Vol. 6 of 8, Reasons for Judgment dated May 30, 2013.

[9] State v. Buras, No. 2013 KW 1256 (La. App. 1st Cir. Dec. 9, 2013); State Rec., Vol. 6 of 8.

[10] State ex rel. Buras v. State, 149 So.3d 258 (La. 2014); State Rec., Vol. 6 of 8.

[11] Rec. Doc. 1.  "A prisoner's habeas application is considered 'filed' when delivered to the prison authorities for mailing to the district court."   Roberts v. Cockrell, 319 F.3d 690, 691 n.2 (5th Cir. 2003).  For the purposes of this decision, the undersigned will assume that the application was delivered to prison authorities for mailing on the date it was signed, i.e. December 21, 2014.

[12] Rec. Docs. 11 and 12.

[13] Rec. Doc. 13.

**Timeliness**

The state first argues that petitioner's federal application is untimely.  The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") generally requires that a petitioner bring his Section 2254 claims within one (1) year of the date on which his underlying criminal judgment becomes "final."  28 U.S.C. § 2244(d)(1)(A).[14]  On that point, the United States Fifth Circuit Court of Appeals has explained:

> The statute of limitations for bringing a federal habeas petition challenging a state conviction begins to run on "the date on which the [state] judgment became final by the conclusion of direct review or the expiration of the time for seeking such review."  28 U.S.C. § 2244(d)(1)(A).  When a habeas petitioner has pursued relief on direct appeal through his state's highest court, his conviction becomes final ninety days after the highest court's judgment is entered, upon the expiration of time for filing an application for writ of certiorari with the United States Supreme Court.  Roberts v. Cockrell, 319 F.3d 690, 693 (5th Cir. 2003).

Butler v. Cain, 533 F.3d 314, 317 (5th Cir. 2008).

Here, the Louisiana Supreme Court denied petitioner's direct-review writ application on November 14, 2011.  As a result, his state criminal judgment became final for AEDPA purposes, and his federal limitations period therefore commenced, ninety days later on February 13, 2012.[15] His limitations period then expired one year later, unless that deadline was extended through tolling.

The Court first considers statutory tolling.  Regarding the statute of limitations, the AEDPA expressly provides:  "The time during which a properly filed application for State post-conviction

---

[14] Although 28 U.S.C. § 2244(d)(1) has alternative provisions providing for other events which can trigger the commencement of the statute of limitations, those alternative provisions are not applicable in the instant case.

[15] Because the ninetieth day fell on a Sunday, petitioner's deadline was extended through the following Monday, February 13, 2012.  See Flanagan v. Johnson, 154 F.3d 196, 202 (5th Cir. 1998) ("We hold that [Fed.R.Civ.P.] 6(a) applies to the computation of the one year limitation period in § 2244(d) of AEDPA."); Fed. R. Civ. P. 6(a) (if the last day of an applicable period is a Saturday, a Sunday, a legal holiday, or a day when the clerk's office is inaccessible, the period runs until the end of the next day that is not one of those days).

or other collateral review with respect to the pertinent judgment or claim is pending shall not be counted toward any period of limitation under this subsection."  28 U.S.C. § 2244(d)(2).

Here, petitioner filed two state post-conviction applications.  However, the crucial issue in this case is whether the federal limitations period was tolled by both applications or, instead, by only the second one.  If the first application tolled the federal limitations period, then his federal application is timely; on the other hand, his federal application is arguably untimely if only the second application tolled the limitations period.

The state argues that petitioner's first post-conviction application did not toll the federal limitations period because it was not "properly filed" as required by § 2244(d)(2).  Specifically, the state argues that petitioner's first application was improper because it was not on the required form,[16] and courts have indeed held that an application submitted on the wrong form cannot be considered "properly filed" for tolling purposes.  See, e.g., Austin v. Carroll, No. 04-3811, 224 Fed. App'x 161, 163-64 (3rd Cir. 2007).

However, as petitioner notes, the state's argument is factually inaccurate – his application was not rejected by the state district court because he failed to use the proper form; rather, it was rejected because it was not notarized.[17]  Nevertheless, while petitioner is correct on that point, his failure to have his application notarized presents its own problems.  For example, at least one section of this Court has held that the federal limitations period is not tolled by a post-conviction

---

[16] Rec. Doc. 12, p. 3.  Louisiana law provides:  "The petitioner shall use the uniform application for post conviction relief approved by the Supreme Court of Louisiana.  If the petitioner fails to use the uniform application, the court may provide the petitioner with the uniform application and require its use."  La. Code Crim. P. art. 926(D).

[17] Rec. Doc. 13, pp. 1-2; State Rec., Vol. 5 of 8, Letter to petitioner from Judge William J. Crain dated December 7, 2012.  Louisiana law further provides:  "The application shall be signed by the petitioner and be accompanied by his affidavit that the allegations contained in the petition are true to the best of his information and belief."  La. Code Crim. P. art. 926(C).  The Uniform Application for Post-Conviction Relief, which is set forth in Appendix A to the Rules of the Louisiana Supreme Court, includes the required affidavit and a space for notarization.

application that is not notarized. Cooley v. Cain, Civ. Action No. 11-455, 2012 WL 893417, at *3 (E.D. La. Feb. 6, 2012), adopted, 2012 WL 893151 (E.D. La. Mar. 15, 2012).

That said, the undersigned is hesitant to recommend that the federal limitations be applied so strictly under the facts of this case. As the United States Fifth Circuit Court of Appeals has noted: "We must be cautious not to apply the statute of limitations too harshly. 'Dismissal of a first habeas petition is a particularly serious matter, for that dismissal denies the petitioner the protections of the Great Writ entirely, risking injury to an important interest in human liberty.'" Fisher v. Johnson, 174 F.3d 710, 713 (5th Cir. 1999) (quoting Lonchar v. Thomas, 517 U.S. 314, 324 (1996)).

Here, petitioner is an incarcerated individual, and, as such, is entirely dependent on prison officials to provide him with access to notarial services. Petitioner argues that he attempted to comply with the rules in this case, but that the prison notary, a person over whom petitioner presumably has no control, mailed the application to the court without completing the notarization. Under these circumstances, and in light of the fact that petitioner quickly corrected the defect upon being advised of the problem by the state district court, the undersigned declines to recommend that tolling credit be withheld from petitioner with respect to this technical defect in his first application.

Accordingly, the undersigned finds that after two hundred seventy-four (274) days elapsed, petitioner tolled his federal limitations period by filing his first state post-conviction application with the state district court on November 14, 2012.[18]   The undersigned further finds that the

---

[18] Even if the undersigned is being overly generous in finding that the technically defective first application tolled the federal limitations period, the same end could arguably be reached in another way. The United States Supreme Court has expressly held that the AEDPA's statute of limitations is also subject to *equitable* tolling. Holland v. Florida, 560 U.S. 631, 645 (2010). If the District Judge determines that *statutory* tolling cannot be granted for the first application,

limitations period then remained tolled until the Louisiana Supreme Court ultimately denied relief on September 26, 2014.[19]

When the federal limitations period resumed running at that point, petitioner had ninety-one (91) days remaining.   Therefore, he had until December 26, 2014, to file his federal application. Because his federal application was filed on December 21, 2014, it was timely.

In light of that fact and the state's concession that petitioner has exhausted his remedies in the state courts,[20] the undersigned will address petitioner's claims.

### Standards of Review

The AEDPA comprehensively overhauled federal habeas corpus legislation, including 28 U.S.C. § 2254.  Amended subsections 2254(d)(1) and (2) contain revised standards of review for pure questions of fact, pure questions of law, and mixed questions of both.  The amendments "modified a federal habeas court's role in reviewing state prisoner applications in order to prevent federal habeas 'retrials' and to ensure that state-court convictions are given effect to the extent possible under law." Bell v. Cone, 535 U.S. 685, 693 (2002).

As to pure questions of fact, factual findings are presumed to be correct and a federal court will give deference to the state court's decision unless it "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."  28 U.S.C. § 2254(d)(2); see also 28 U.S.C. § 2254(e)(1) ("In a proceeding instituted by an application

---

the undersigned alternatively recommends that the period of statutory tolling lost due to the prison notary's failure be *equitably* tolled, thereby still rendering petitioner's federal application timely.

[19] Tolling continues uninterrupted for the duration of the post-conviction proceedings, so long as a petitioner sought supervisory review in a timely manner.  Grillette v. Warden, Winn Correctional Center, 372 F.3d 765, 769-71 (5th Cir. 2004).  The state does not challenge the timeliness of petitioner's related writ applications.  See Rec. Doc. 12, p. 4.

[20] Rec. Doc. 12, p. 6.

6

for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court, a determination of a factual issue made by a State court shall be presumed to be correct. The applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence.").

As to pure questions of law and mixed questions of law and fact, a federal court must defer to the state court's decision on the merits of such a claim unless that decision "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1). Courts have held that the "'contrary to' and 'unreasonable application' clauses [of § 2254(d)(1)] have independent meaning." Bell, 535 U.S. at 694.

Regarding the "contrary to" clause, the United States Fifth Circuit Court of Appeals has explained:

> A state court decision is contrary to clearly established precedent if the state court applies a rule that contradicts the governing law set forth in the [United States] Supreme Court's cases. A state-court decision will also be contrary to clearly established precedent if the state court confronts a set of facts that are materially indistinguishable from a decision of the [United States] Supreme Court and nevertheless arrives at a result different from [United States] Supreme Court precedent.

Wooten v. Thaler, 598 F.3d 215, 218 (5th Cir. 2010) (internal quotation marks, ellipses, brackets, and footnotes omitted).

Regarding the "unreasonable application" clause, the United States Supreme Court has held: "[A] state-court decision is an unreasonable application of our clearly established precedent if it correctly identifies the governing legal rule but applies that rule unreasonably to the facts of a

particular prisoner's case."  White v. Woodall, 134 S. Ct. 1697, 1706 (2014).  However, the

Supreme Court cautioned:

> Section 2254(d)(1) provides a remedy for instances in which a state court
> unreasonably applies this Court's precedent; it does not require state courts to
> extend that precedent or license federal courts to treat the failure to do so as error.
> Thus, if a habeas court must extend a rationale before it can apply to the facts at
> hand, then by definition the rationale was not clearly established at the time of the
> state-court decision.   AEDPA's carefully constructed framework would be
> undermined if habeas courts introduced rules not clearly established under the guise
> of extensions to existing law.

Id. (citations and quotation marks omitted).  Therefore, when the Supreme Court's "cases give no

clear answer to the question presented, let alone one in [the petitioner's] favor, it cannot be said

that the state court unreasonably applied clearly established Federal law."  Wright v. Van Patten,

552 U.S. 120, 126 (2008) (quotation marks and brackets omitted).  The Supreme Court has also

expressly cautioned that "an unreasonable application is different from an incorrect one."  Bell,

535 U.S. at 694.  Accordingly, a state court's merely incorrect application of Supreme Court

precedent simply does not warrant habeas relief.  Puckett v. Epps, 641 F.3d 657, 663 (5th Cir.

2011) ("Importantly, 'unreasonable' is not the same as 'erroneous' or 'incorrect'; an incorrect

application of the law by a state court will nonetheless be affirmed if it is not simultaneously

unreasonable.").

While the AEDPA standards of review are strict and narrow, they are purposely so.  As the

United States Supreme Court has held:

> [E]ven a strong case for relief does not mean the state court's contrary conclusion
> was unreasonable.
>           If this standard is difficult to meet, that is because it was meant to be.  As
> amended by AEDPA, § 2254(d) stops short of imposing a complete bar on federal
> court relitigation of claims already rejected in state proceedings.  It preserves
> authority to issue the writ in cases where there is no possibility fairminded jurists
> could disagree that the state court's decision conflicts with this Court's precedents.

It goes no farther.  Section 2254(d) reflects the view that habeas corpus is a guard against *extreme malfunctions* in the state criminal justice systems, *not a substitute for ordinary error correction through appeal.  As a condition for obtaining habeas corpus from a federal court, a state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement.*

Harrington v. Richter, 562 U.S. 86, 102-03 (2011) (citations omitted; emphasis added); see also

Renico v. Lett, 559 U.S. 766, 779 (2010) ("AEDPA prevents defendants – and federal courts –

from using federal habeas corpus review as a vehicle to second-guess the reasonable decisions of

state courts.").

The Supreme Court has expressly warned that although "some federal judges find [28

U.S.C. § 2254(d)] too confining," it is nevertheless clear that "all federal judges must obey" the

law and apply the strictly deferential standards of review mandated therein.  White v. Woodall,

134 S. Ct. 1697, 1701 (2014).

## Facts

On direct appeal, the Louisiana First Circuit Court of Appeal summarized the facts of this

case as follows:

> The facts in this case were not fully developed because the defendant entered a guilty plea herein.  In accordance with testimony presented at the motion to suppress hearing, on or about November 14, 2005, officers of the St. Tammany Parish Sheriff's Office responded to a location off Interstate 59, where a woman's body was found in the Pearl River in St. Tammany Parish.  A pair of ladies' jeans, pink plastic shoes, a baseball cap, and duct tape were located along the sandy beach area, and a short distance into the water was the partially-clad body lying face down in the water with duct tape on her hands and mouth.  The victim had no outer clothing on the lower portion of her body, and her underwear was partially pulled down.  There were indications of a struggle in the sand and drag marks from the clothes to the water.  One of the fingers on the female's hand was missing a fingernail.  The body was later identified as Katie Wilkerson, a resident of Bayou La Batre, Alabama.  The autopsy indicated that the victim was strangled and drowned.  Interviews of the victim's family members and friends led officers to

conclude that the victim travelled from Alabama to Louisiana with the defendant before her death.  The defendant ultimately pled guilty to the murder of the victim.[21]

## Petitioner's Claims

## Fourth Amendment Claims

In his first two claims, petitioner argues that the state courts violated his constitutional rights under the Fourth Amendment by denying a motion to suppress evidence.  Specifically, he argues that the arrest and search warrants in this case were invalid because they were obtained based on intentionally false misrepresentations and, further, that DNA evidence was obtained from him *prior* to the issuance of a warrant.  On direct appeal, the Louisiana First Circuit Court of Appeal denied these claims, holding:

**Motion to Suppress Hearing**
At the motion to suppress hearing herein, the defendant was described as a white, baldheaded male, wearing eyeglasses.  According to the testimony presented at the hearing, the investigators interviewed individuals who ultimately named the defendant as the person with whom the victim travelled from Alabama to Slidell, Louisiana, on the night of November 13, 2005.  Specifically, that night, Latasha Miller, the victim's friend, took her to Food World in Alabama between 7:00 and 7:30 p.m. to meet someone named "Eric."  Miller informed the police that the victim left Food World with the person known to her as "Eric," who was driving a dark blue Chevy S-10, newer model pickup truck.  "Eric" was wearing a baseball cap and eyeglasses at the time.  Miller did not get a good look at the male because it was dark, and she did not specifically identify him as the defendant.  The police obtained surveillance footage showing the victim getting out of Miller's vehicle and getting into a vehicle as described.
Beth Smith also informed Detective Demma that she knew the victim planned to leave Alabama with "Eric Buras."  Smith further stated the victim knew Buras from a trailer park where she used to live.  Smith identified the defendant by photograph as the "Eric Buras" to whom she referred.  Although she did not see them on the night in question, Smith had seen the victim with the defendant one or two nights before.
The police then determined the defendant's place of employment and address and discovered that the defendant was not at work on the date of the offense.

---

[21] <u>State v. Buras</u>, No. 2010 KA 0669, 2010 WL 4272876, at *1 (La. App. 1st Cir. Oct. 29, 2006); State Rec., Vol. 5 of 8.

Moreover, they determined that the defendant drove a blue Chevrolet S-10 pickup truck.  The defendant's address was on Irvington-Bayou La Batre Highway, in Irvington, Alabama.  Officers of the Mobile County Sheriff's Office and St. Tammany Parish Sheriff's Office went to the defendant's address.  Detective Richard Bryars of the Mobile County Sheriff's Office testified that the officers went to the defendant's residence to secure the home and the vehicle while seeking search warrants.  Although the defendant and Claudia Jane Buras were divorced at the time of the trial, at the time of the offense Ms. Buras was married to and residing with the defendant.  Detective Bryars stated that when he and other detectives approached Ms. Buras, outside of the Buras's residence to ask about the defendant's whereabouts, she stated that the defendant was at work but she granted them permission to enter the residence, stating, "[G]o right ahead," and she walked them to the door.

Captain Barney Tyrney of the St. Tammany Parish Sheriff's Office was present at the defendant's residence.  Captain Tyrney testified that Ms. Buras stated that the defendant was not home and when asked if it would be okay for the officers to go inside and look around the home to confirm that, she agreed and escorted them.  According to Captain Tyrney, the defendant appeared to be "hiding," when he was discovered just outside the back door to a porch or utility room of the home and looking up through a window.  Captain Tyrney grabbed the defendant and forced him down to check for weapons.  After the pat down, the defendant stood up and the "situation was calm at that point."  Neither Captain Tyrney nor Detective Buras [sic] recalled the defendant being handcuffed or any weapons being pointed at him.  Captain Tyrney further testified that the defendant was transported to the station on a voluntary basis.

During cross-examination, Captain Tyrney stated that he may have drawn his weapon before entering the home but he was not certain.  He remembered there was a small child inside the home but noted that Ms. Buras was not holding the baby when they first encountered her outside but she did have the child at some point inside the home.  Ms. Buras testimony conflicted with that of the officers; Ms. Buras testified that she was holding her baby when she initially encountered the police officers outside.

Captain Tyrney could not recall whether the defendant was Mirandized after he was identified at his residence but stated that the defendant was asked if he would come to the station to be questioned, and the defendant agreed.  Captain Tyrney further testified that they were only at the defendant's residence for ten or fifteen minutes before they went to the station.  He was not certain as to whether the defendant was ever handcuffed; he only knew for certain that he did not handcuff the defendant.

St. Tammany Parish Sheriff's Office Detective DeJong and Detective Demma interviewed Ms. Buras and the defendant.  The defendant and Ms. Buras were taken to a substation for a brief period before being relocated to the Mobile County Sheriff's Office Investigations Division.  Detective Demma provided consistent testimony regarding the information Ms. Buras provided as to the

defendant's actions on the night in question and into the next morning.  The officers obtained a recorded statement from Ms. Buras before interviewing the defendant. Detective Demma stated that he was informed of an attorney being present to represent Ms. Buras after she was questioned but before the defendant was questioned.  Detective Demma testified that the defendant was not handcuffed and guns were not pointed at him at the station.  Detective Demma further testified that the defendant was read his <u>Miranda</u> rights before questioning, and the defendant did not initially request an attorney.  Detective Demma informed the defendant that they were conducting a homicide investigation and that he was a suspect.  After being fully advised of his rights, the defendant was questioned.  He admitted that he met the victim on the night in question and drove her to Louisiana.  He stated that he ultimately drove her back to Alabama.  After the officers informed him that the victim's body had been discovered, the defendant requested an attorney, and the questioning ceased.  The officers then sought to obtain a warrant for the defendant's arrest.

The arrest warrant was typed by Detective Picone and dictated by Detective Demma, who noted that the verbiage in the third paragraph of the arrest warrant affidavit was not entirely accurate.  The affidavit specifically included the following language:

> On Sunday, November 14th between 7:30 and 8:00 p.m. Wilkerson was seen leaving Bayou Labatre, Alabama, with Eric Buras in his dark colored Chevrolet pick up truck, enroute to Slidell, Louisiana. According to witness, the two were going to make an illegal narcotics buy in Slidell.  This witness positively identified Eric Buras as the individual she left with.

Detective Demma conceded that the statement was misleading in that it implied that one witness specifically identified the driver as the defendant. Detective Demma testified that the police, in actuality, concluded that the victim left with the defendant based on statements made by more than one witness, including Beth Smith, Latasha Miller, and Gene Wilkerson, a relative of the victim. Detective Demma acknowledged that Miller was unable to identify the defendant as the person she knew as Eric, with whom she witnessed the victim get in the blue Chevrolet S-10 pickup truck.  Detective Demma testified that the error was inadvertent and although it had been brought to his attention, the incorrect language of the affidavit was used as a pattern for the affidavit for a subsequent search warrant.  He testified that his police reports provided an accurate account of the police investigation determinations.

During cross-examination, Detective Demma confirmed that there was no statement in his report that indicated that Miller mentioned the driver as wearing eyeglasses although Detective Demma recalled her stating so.  His report also did not state that he informed the defendant of the purpose for the questioning, although he testified that he did so before questioning the defendant.  Detective Demma

specified that he noticed the error in the affidavit when he reviewed the basis for the search warrant for the defendant's residence at the time of its execution. Detective Demma confirmed that the search warrant for the defendant's vehicle and to obtain DNA evidence from the defendant also tracked the language from the arrest warrant.  Detective Demma stated that the officers decided to keep the language for the warrants consistent and stated that it was debatable as to whether the verbiage could be considered false.

Ms. Buras proffered testimony before the motion to suppress hearing before testifying again at the hearing.  Her testimony indicated that on November 16, 2005, two officers approached her when she checked the mail just outside of her residence, consistent with the testimony of the police.  According to Ms. Buras, she was holding her baby at the time.  Ms. Buras stated that she wanted the officers to wait before entering because she needed to change her baby's diaper.  During cross-examination, she testified that over ten police officers were at a store next door to her residence when two of the officers approached her.  She further stated that the officers did not state their purpose for being there.  During her prehearing proffered testimony, she stated that she informed them the defendant was not there but testified at the hearing that she informed the officers that she did not know where he was, adding, "because he was somewhere in the house and I really didn't know where he was at the time."

According to Ms. Buras, the officers entered her residence with guns drawn, shoving her onto her sofa while she was holding her baby.  When asked if the officers did not have permission to enter the residence at that time, Ms. Buras responded positively.  She stated that six officers entered the residence, and the defendant was found on the back porch with their dogs.  The defendant was thrown on the ground and patted down before being taken to the police station.  Ms. Buras further testified that the police told her that she did not have to come to the station, but she went on her own free will.  According to Ms. Buras, the officers were at their house for about an hour to an hour and a half before they were transported to the police station.  During that time period, neither of them was handcuffed, and they were outside talking to the officers.  Her father, who lived next door, approached the fence while they were outside and said he would try to get them an attorney.  While she was unsure, she stated that the police may have taken possession of the defendant's wallet and its contents and the truck at that time.

Ms. Buras further testified that upon arrival at the substation, they sat in a room about an hour to an hour and a half.  A detective they knew came to take the defendant to another substation and handcuffed him.  She went with the defendant and waited in a room about two hours.  She stated that an attorney was there for her and the defendant, and that she personally talked to the attorney before she was questioned.  She testified, however, that she did not need an attorney and did not ask to speak to an attorney.  She admitted that she initially lied to the police in an effort to protect her husband.  She ultimately informed the police that on November 13, 2005, the defendant left home around dusk, between 6:00 and 6:30 p.m., wearing carpenter jeans, slip-on Dr. Scholl's shoes, and a Jeff Gordon hat with the

number twenty-four on it and a Velcro closing, travelling in a blue Chevy S-10 truck.  She testified that the defendant was protective of his truck and would not allow her or anyone else to drive it.

Ms. Buras called the defendant several times that night, but he did not answer the phone calls.  She stated that the defendant returned about 2:30 to 3:00 a.m., soaked from the waist down.  Ms. Buras was awake when he came home angry.  The defendant was wearing sandals, as opposed to the slip-on shoes that he had on when he left the night before, and a tank-top shirt with no sleeves, as opposed to the T-shirt that he was wearing when he left.  She stated that the defendant took off his wet clothes and began cleaning his truck when he came home that morning.  Ms. Buras noted that she discovered sand in the washing machine after washing the defendant's clothes.  Ms. Buras was shown State's exhibits M-1, 2, 5, 6, 7, and 8.  She identified the defendant's hat, shirt, shoes, boxers, and wallet.  When asked if she knew the victim, Ms. Buras stated that before she and defendant were married, they lived next door to the victim in a trailer park for about two weeks.  She stated that she left the police station about 1:30 or 2:00 a.m.

Reginald Collins, Ms. Buras's father, testified that when he came outside and asked his daughter what was going on, she stated that she did not know, and an officer told him that it was not his business.  Collins instructed the defendant and his daughter to "keep your mouth shut until I get a lawyer."  Collins testified that the officers were outside of the residence with the defendant and Ms. Buras for fifteen to twenty minutes before Collins left to go to his office.  According to his testimony, he was able to inform Joe Kulakowski, an attorney, that the incident involved a death, stating that he was informed so by Ron Goldman, the first attorney he contacted.  He stated that Kulakowski went to the station and was denied access to the defendant and Ms. Buras.  Collins called his daughter on her cellular telephone and told her that the attorney was at the station.  Kulakowski called Collins and informed him that he could not represent both the defendant and his daughter, and Collins instructed him to represent his daughter.

Defense witness Officer Michael Futch testified that he assisted detectives in the execution of the DNA search warrant on January 6, 2006.  Officer Futch testified that, in accordance with his report, the officers met at the St. Tammany Parish jail that morning at approximately 9:00 a.m.  He confirmed that the time and date on the DNA evidence search warrant signed by the judge was January 6, 2006, 10:05 a.m.  During cross-examination, he further confirmed that he was not relying on his independent recollection but on his report.  He was, however, certain that the DNA swab was taken subsequent and pursuant to the acquisition of the warrant.

In denying the motions to suppress, the trial court concluded that the police officers had probable cause to believe that the defendant was the person with whom the victim left.  The trial court noted that the affidavits reflected an accumulation of information that was gathered by the investigating officers in connection with their investigation of the crime.  The trial court did not believe that Detective Demma and Detective Picone made intentional misrepresentations or presented fraudulent information.  The trial court further found that if the misleading portion

14

of the affidavit were excised, there was still a basis for probable cause to link the defendant to the offense, noting the statements provided by Ms. Buras and that blue fibers on the duct tape found at the scene may have been from the defendant's truck. Additionally, the trial court found that the statements by Ms. Buras and the defendant were free and voluntary under advisement of <u>Miranda</u> rights.  It also noted that questioning ceased when the defendant requested an attorney.

When a trial court denies a motion to suppress, factual and credibility determinations should not be reversed in the absence of a clear abuse of the trial court's discretion, i.e., unless such ruling is not supported by the evidence.  <u>See</u> <u>State v. Green</u>, 94-0887, p. 11 (La. 5/22/95), 655 So.2d 272, 280-81.  However, a trial court's legal findings are subject to a *de novo* standard of review.  <u>See</u> <u>State v. Hunt</u>, 2009-1589, p. 6 (La. 12/1/09), 25 So.3d 746, 751.

**Misrepresentations and Probable Cause**

Probable cause for an arrest exists when the facts and circumstances known to the police and of which the police have reasonable trustworthy information are sufficient to justify a person of average caution in the belief that the person to be arrested has committed a crime.  <u>State v. Williams</u>, 448 So.2d 659, 662 (La. 1984). The fact that a better showing of probable cause could be made by the affiant does not detract from the showing of probable cause that is made.  <u>Id</u>. at p. 663.  Minor inaccuracies in assertions in the affidavit may not affect the validity of the warrant. <u>Id</u>.  However, if intentional misrepresentations designed to deceive the issuing magistrate are made by the affiant seeking to obtain the warrant, the warrant must be quashed.  <u>Id</u>.  Alternatively, if unintentional misstatements are included, these misstatements must be excised and the remainder used to determine if probable cause for the issuance of a warrant is set forth.  <u>Id</u>.  Similarly, when the affiant omits material facts without intent to deceive, the reviewing court must add the omitted facts to those originally included and retest the sufficiency of the showing of probable cause.  <u>Id</u>.  The term "intentional" means a deliberate act made for the purpose of deceiving the magistrate.  <u>State v. Rey</u>, 351 So.2d 489, 492 n. 1 (La. 1977).

The same body of law applies to search warrants.  The making of material and intentional misrepresentations to a magistrate in an effort to secure a search warrant involves a fraud upon the court and results in the invalidation of the warrant and suppression of the items seized.  If the misrepresentations or omissions are inadvertent or negligent, the warrant should be retested for probable cause after supplying that which had been omitted or striking that which had been misrepresented.  <u>State v. Byrd</u>, 568 So.2d 554, 559 (La. 1990).

Based on the circumstances presented in the instant case, we conclude that the trial court did not err when it denied the motions to suppress based on allegations in the affidavits.  The affiant need only specify "to the best of his knowledge and belief the basic details of the crime alleged to have been committed.["]  The person executing the affidavit upon which the warrant is issued is not required to have firsthand knowledge of the offense alleged to have been

committed.  State v. Jenkins, 338 So.2d 276, 280 (La. 1976).  See La.C.Cr.P. art. 202(A).

There is no indication of intentional misrepresentations or deliberate deception.  It is clear that the Louisiana and Alabama police officers were working together and relaying information to each other in an effort to investigate the death of an Alabama resident whose body was found in Louisiana.  While no witness specifically identified the defendant as the person with whom the victim was seen getting into the defendant's truck on the night in question, the statements that the police obtained from several witnesses contained an abundance of evidence from which one could reasonably conclude that the victim left with the defendant as indicated in the affidavits.

Moreover, if we assume that the information in question (that the witness saw the victim leave with the defendant) was misleading and excise it, the unchallenged information remaining within the affidavits constitutes probable cause for the issuance of the warrants.  Miller did see the victim get into a Chevrolet pickup truck; that portion is not challenged as misleading.   The officers' confirmation that the defendant had such a vehicle is documented in the affidavit.  Another witness, Smith, informed the police that the victim went to Slidell, Louisiana, with the defendant on the night in question.  As stated in the affidavits, a Jeff Gordon baseball cap with the number twenty-four was recovered at the scene along with duct tape with possible white animal hair stuck to the roll.  The affidavit further indicates that two white-haired dogs were located at the defendant's residence.  Ms. Buras' statements also were included in the affidavit, including the fact that the defendant left their home on the night in question wearing the described baseball cap and returned home with wet clothes, which left sand in her washing machine when they were washed.  Thus, the warrants were based on probable cause that the defendant committed the instant offense.  The counseled assignment of error and *pro se* assignments of error numbers one, two, and three are without merit.

**Buccal Swab/DNA Warrant**

The testimony presented at the hearing does not establish the exact time the buccal swab was taken from the defendant.  While the officers may have met at approximately 9:00 a.m., Officer Futch's testimony established that the swab was not taken until after the search warrant for the evidence was obtained.  Thus, we find there is no merit to the argument raised in the fourth *pro se* assignment of error.[22]

The Louisiana Supreme Court then likewise denied relief without assigning additional reasons.[23]

---

[22] State v. Buras, No. 2010 KA 0669, 2010 WL 4272876, at *3-9 (La. App. 1st Cir. Oct. 29, 2006) (footnote omitted); State Rec., Vol. 5 of 8.
[23] State v. Buras, 56 So.3d 465 (La. 2011); State Rec., Vol. 5 of 8.

This Court is barred from reviewing these Fourth Amendment claims by <u>Stone v. Powell</u>, 428 U.S. 465 (1976).[24]  In <u>Stone</u>, the United States Supreme Court held:  "[W]here the State has provided an opportunity for full and fair litigation of a Fourth Amendment claim, a state prisoner may not be granted federal habeas corpus relief on the ground that evidence obtained in an unconstitutional search and seizure was introduced at trial."  <u>Id</u>. at 494 (footnote omitted); <u>see also</u> <u>Janecka v. Cockrell</u>, 301 F.3d 316, 320 (5th Cir. 2002).  Interpreting <u>Stone</u>, the United States Fifth Circuit Court of Appeals has held:

> An "opportunity for full and fair litigation" means just that:  an opportunity.  If a state provides the processes whereby a defendant can obtain full and fair litigation of a fourth amendment claim, <u>Stone v. Powell</u> bars federal habeas corpus consideration of that claim whether or not the defendant employs those processes.

<u>Caver v. Alabama</u>, 577 F.2d 1188, 1192 (5th Cir. 1978).  Therefore, the <u>Stone</u> bar applies even in those cases where no motion to suppress was ever filed.  <u>Id</u>. at 1192-93.  The <u>Stone</u> bar further applies even if the state court rulings on the Fourth Amendment claims were erroneous.  <u>Swicegood v. Alabama</u>, 577 F.2d 1322, 1324 (5th Cir. 1978).

<u>Stone</u> clearly applies here.  As an initial matter, the Court notes that "[i]t is beyond cavil that Louisiana courts provide criminal defendants the opportunity to raise Fourth Amendment claims."  <u>Bailey v. Cain</u>, Civil Action No. 06-839, 2007 WL 1198911, at *13 (E.D. La. Apr. 20, 2007).  Moreover, petitioner in fact availed himself of that opportunity.  The state court record shows that defense counsel filed a motion to suppress, his Fourth Amendment claims were fully litigated and denied at an evidentiary hearing, and the claims were asserted, considered, and again

---

[24] The state does not raise the <u>Stone</u> bar in its response.  Nevertheless, the United States Fifth Circuit Court of Appeals has held that the <u>Stone</u> bar may be raised by the Court.  <u>Davis v. Blackburn</u>, 803 F.2d 1371, 1372-73 (5th Cir. 1986); <u>Bourgeois v. Bergeron</u>, Civ. Action No. 09-3185, 2009 WL 5088756, at *6 n.19 (E.D. La. Dec. 23, 2009).  The undersigned, through this Report and Recommendation, hereby places petitioner on notice that the <u>Stone</u> bar is being invoked *sua sponte*.

denied on direct review.  As a result, it is clear that <u>Stone</u> now prohibits petitioner from reasserting his Fourth Amendment claims in this federal proceeding.  Accordingly, these claims should be denied.

### Sixth Amendment Claims

In his remaining claims, petitioner argues that he received ineffective assistance of counsel in violation of the Sixth Amendment.  In the state post-conviction proceedings, the state district court denied those claims, holding:

> Petitioner now brings this application asserting the following four claims for relief:
>
> **Claim No. 1:**  Whether the prosecuting attorney advising the State's witness not to disclose information to the defense significantly interfered with defendant's guaranteed Sixth Amendment right to effective counsel;
> **Claim No. 2:**  Whether petitioner was denied his fundamental rights of the Sixth Amendment to present a defense, access to the courts and effective assistance of counsel for his defense in denying him access to State-funded resources to obtain defense experts;
> **Claim No. 3:**  Whether counsel was ineffective in refusing to subpoena critical witnesses for the suppression hearing when directed to do so by the defendant; and
> **Claim No. 4:**  Whether counsel was ineffective in abandoning petitioner's motion to suppress identification.
>
> The Supreme Court in <u>Strickland v. Washington</u>, 466 U.S. 668, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984) set forth the standard for analysis of an ineffective assistance of counsel claim as follows:
>
>> A convicted defendant's claim that counsel's assistance was so defective as to require reversal of a conviction or a death sentence has two components.  First, the defendant must show that counsel's performance was deficient.  This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense.  This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.  Unless a defendant makes both showings, it cannot be said that the conviction or death sentence resulted from

a breakdown in the adversary process that renders the result unreliable.

In the context of a guilty plea, in order to establish the Strickland prejudice prong, a defendant must prove that there is a reasonable probability that, but for counsel's error, he would not have pleaded guilty and would have insisted on going to trial.  Hill v. Lockhart, 474 U.S. 52, 102 S. Ct. 366, 370 L. Ed. 2d 203 (1985).

In connection with petitioner's first claim, he asserts that Karen Middleton (ADA) met with Claudia Buras February 1-8, 2009 in anticipation of the perpetuation of Claudia's testimony on February 9, 2009.  Petitioner argues:

> "During the course of this meeting, Mrs. Middleton, without gloved hands, commenced to opening every piece of physical evidence, and directed Mrs. Buras as to how she should identify each in open court. If Mrs. Buras was not sure as to the identification of such, Mrs. Middleton instructed her identification on each piece.  At the close of this meeting, Mrs. Middleton instructed Mrs. Buras not to inform the Petitioner or his counsel of the meeting."

In his application, petitioner claimed that this meeting took place in Alabama; however, in a subsequent filing with the Court petitioner states that the meeting took place at the District Attorney's Office in St. Tammany Parish.  Petitioner argues that he only recently learned of these meetings which occurred almost four years prior to the filing of this application, and when he supposedly asked his ex-wife to execute an affidavit to that effect, she was threatened with incarceration by probation officer.  He offers Claudia's letter as Exhibit D to his application as proof of this assertion.  The pertinent parts of that one page letter written over 11 days state:  "As for that thing you need for me to do.  My probation officer told me I can get into trouble… Yes I got your letter and I do want u to come back and be Sabrina's father but it will volute (sic) my probation and u remember why."

Further, petitioner fails to indicate what items were misidentified by Claudia Buras at the perpetuation hearing or specifically how petitioner's attorney was denied the opportunity to adequately prepare a defense.  Petitioner seems to imply that in the more than three years between the crime and the perpetuation hearing that Claudia Buras was absolutely prevented from talking to petitioner's attorney which seems to have been the case in State v. Hammler, 312 So.2d 306 (La. 1975) and Gregory v. U.S., 369 F.2d 185, 125 U.S. App. D.C. 140 (C.A.D.C. 1966) cited by petitioner.  Finally, the Court notes that Claudia's statements to the arresting officers and her testimony at the perpetuation and suppression hearings were consistent insofar as the identification of the physical evidence.  Therefore, the Court finds that petitioner Buras' first claim is without merit and is denied.

In his second claim, petitioner asserts that both of his appointed counsel were inadequate and he was dissatisfied with their representation.  In support of his argument, petitioner cites to various books, reports and standards which indicate

that the Public Defender's Office of the 22nd Judicial District Court is overloaded and underfunded.  Petitioner argues that his requests for funding in order to obtain expert assistance were ignored and/or refused by the Court and defense counsel, and he contends that, in essence, no funding equated with no defense.  Petitioner states that he was "forced against his will to plead guilty" and that he answered the questions "at the plea colloquy in a manner that would secure that the plea was accepted by the court."  He asks that the indictment be quashed or the evidence be suppressed on the basis that it was cross-contaminated.  The Court has reviewed the record in this matter and finds that a thorough Boykin examination was conducted by the Court on September 28, 2009.  Mr. Buras entered a <u>Crosby</u> plea under oath and in a knowing and voluntary manner.  Petitioner Buras has failed to satisfy the burden of proving that counsel was ineffective for pursuing, in Buras' words, the "one bona fide defense available to the defendant; to attack the testing and procedures of the evidence collection and handling procedures, proving the credibility of this evidence deficient."  Petitioner does not allege in his application that retesting the DNA evidence in this case would have revealed that it was not his or that he is in fact innocent of the crime.  Based on the record and the arguments advanced by petitioner, the Court finds that this second claim raised by petitioner Buras is without merit and is denied.

Petitioner's third claim faults counsel for failing to subpoena "critical" witnesses for the suppression hearing.  Specifically, petitioner Buras contends that detectives made intentional misrepresentations in their search and arrest warrants and that one witness' testimony would have revealed those inconsistencies.  The Court finds this same issue was briefed in the appeal, both in counseled and pro-se briefs filed in the First Circuit which thoroughly reviewed the issue.  The First Circuit found no merit in the arguments and upheld petitioner's conviction and sentence.  Therefore, the Court finds this claim is repetitive, without merit, and it is denied.

Petitioner Buras' fourth claim is that his counsel was ineffective by abandoning the petitioner's motion to suppress identification.  Based on this Court's review of the record and specifically the transcript of the hearing on April 17, 2009, defense counsel did not "abandon" the motion to suppress identification but requested that the motion be kept "open for the time being."  This statement must be read in context with the overlapping nature of the motions to suppress which were filed:  motions to suppress identification, confession, and evidence.  Further, it is clear from a reading of the transcript from the hearing date, the transcript from the plea colloquy on September 28, 2009, and the First Circuit Court of Appeal opinion dated October 29, 2010 that the motion to suppress identification was considered by the trial court and denied; and likewise the trial court's ruling was upheld by the appellate court.  Therefore, the Court finds that this claim is without merit and is also denied.[25]

---

[25] State Rec., Vol. 6 of 8, Reasons for Judgment dated May 30, 2013.

Without additional reasons assigned, petitioner's related writ applications were then likewise denied by the Louisiana First Circuit Court of Appeal[26] and the Louisiana Supreme Court.[27]

Because an ineffective assistance of counsel claim presents a mixed question of law and fact, this Court must defer to the state court decision rejecting petitioner's claims unless that decision was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States."  28 U.S.C. § 2254(d)(1); Moore v. Cockrell, 313 F.3d 880, 881 (5th Cir. 2002).  Moreover, the United States Supreme Court has explained that, under the AEDPA, federal habeas corpus review of an ineffective assistance of counsel claim is in fact *doubly* deferential:

> The pivotal question is whether the state court's application of the Strickland standard was unreasonable.  This is different from asking whether defense counsel's performance fell below Strickland's standard.  Were that the inquiry, the analysis would be no different than if, for example, this Court were adjudicating a Strickland claim on direct review of a criminal conviction in a United States district court.  Under AEDPA, though, it is a necessary premise that the two questions are different.  For purposes of § 2254(d)(1), an unreasonable application of federal law is different from an incorrect application of federal law.  A state court must be granted a deference and latitude that are not in operation when the case involves review under the Strickland standard itself.
>
> A state court's determination that a claim lacks merit precludes federal habeas relief so long as fairminded jurists could disagree on the correctness of the state court's decision.  Yarborough v. Alvarado, 541 U.S. 652, 664, 124 S.Ct. 2140, 158 L.Ed.2d 938 (2004).  And as this court has explained, "[E]valuating whether a rule application was unreasonable requires considering the rule's specificity.  The more general the rule, the more leeway courts have in reaching outcomes in case-by-case determinations."  Ibid.  "[I]t is not an unreasonable application of clearly established Federal law for a state court to decline to apply a specific legal rule that has not been squarely established by this Court."  Knowles v. Mirzayance, 556 U.S. ____, ____, 129 S.Ct. 1411, 1413-14, 173 L.Ed.2d 251 (2009) (internal quotation marks omitted).

---

[26] State v. Buras, No. 2013 KW 1256 (La. App. 1st Cir. Dec. 9, 2013); State Rec., Vol. 6 of 8.
[27] State *ex rel.* Buras v. State, 149 So.3d 258 (La. 2014); State Rec., Vol. 6 of 8.

<u>Harrington v. Richter</u>, 562 U.S. 86, 101 (2011) (citation omitted).  The Supreme Court then explained:

> Surmounting <u>Strickland</u>'s high bar is never an easy task.  An ineffective-assistance claim can function as a way to escape rules of waiver and forfeiture and raise issues not presented at trial, and so the <u>Strickland</u> standard must be applied with scrupulous care, lest intrusive post-trial inquiry threaten the integrity of the very adversary process the right to counsel is meant to serve.  Even under *de novo* review, the standard for judging counsel's representation is a most deferential one.  Unlike a later reviewing court, the attorney observed the relevant proceedings, knew of materials outside the record, and interacted with the client, with opposing counsel, and with the judge.  It is all too tempting to second-guess counsel's assistance after conviction or adverse sentence.  The question is whether an attorney's representation amounted to incompetence under prevailing professional norms, not whether it deviated from best practices or most common custom.
>
> Establishing that a state court's application of <u>Strickland</u> was unreasonable under § 2254(d) is all the more difficult.  *The standards created by <u>Strickland</u> and § 2254(d) are both highly deferential, and when the two apply in tandem, review is doubly so.*  The <u>Strickland</u> standard is a general one, so the range of reasonable applications is substantial.  Federal habeas courts must guard against the danger of equating unreasonableness under <u>Strickland</u> with unreasonableness under § 2254(d).  *When § 2254(d) applies, the question is not whether counsel's actions were reasonable.  The question is whether there is any reasonable argument that counsel satisfied <u>Strickland</u>'s deferential standard.*

<u>Id.</u> at 105 (citations omitted; emphasis added).  Therefore, on a habeas review of an ineffective assistance claim, "federal courts are to afford *both* the state court *and* the defense attorney the benefit of the doubt." <u>Woods v. Etherton</u>, 136 S. Ct. 1149, 1151 (2016) (emphasis added; quotation marks omitted).  For the following reasons, the Court finds that, under those stringently deferential standards, it simply cannot be said that relief is warranted with respect to petitioner's ineffective assistance of counsel claims.

Here, the state court correctly identified the clearly established federal law which governs ineffective assistance of counsel claims: <u>Strickland v. Washington</u>, 466 U.S. 668 (1984).  As the state court noted, <u>Strickland</u> established a two-prong test for evaluating such claims.  Specifically,

a petitioner seeking relief must demonstrate (1) that counsel's performance was deficient and (2) that the deficient performance prejudiced his defense.  Id. at 697.  A petitioner bears the burden of proof on such a claim and "must demonstrate, by a preponderance of the evidence, that his counsel was ineffective."  Jernigan v. Collins, 980 F.2d 292, 296 (5th Cir. 1993); see also Clark v. Johnson, 227 F.3d 273, 284 (5th Cir. 2000).  If a court finds that a petitioner has made an insufficient showing as to either of the two prongs of inquiry, i.e. deficient performance or actual prejudice, it may dispose of the ineffective assistance claim without addressing the other prong.  Strickland, 466 U.S. at 697.

To prevail on the deficiency prong of the Strickland test, a petitioner must demonstrate that counsel's conduct fails to meet the constitutional minimum guaranteed by the Sixth Amendment.  See Styron v. Johnson, 262 F.3d 438, 450 (5th Cir. 2001).  "Counsel's performance is deficient if it falls below an objective standard of reasonableness."  Little v. Johnson, 162 F.3d 855, 860 (5th Cir. 1998).  Analysis of counsel's performance must take into account the reasonableness of counsel's actions in light of all the circumstances.  See Strickland, 466 U.S. at 689.  "[I]t is necessary to 'judge ... counsel's challenged conduct on the facts of the particular case, viewed as of the time of counsel's conduct.'"  Lockhart v. Fretwell, 506 U.S. 364, 371 (1993) (quoting Strickland, 466 U.S. at 690).  A petitioner must overcome a strong presumption that the conduct of his counsel falls within a wide range of reasonable representation.  See Crockett v. McCotter, 796 F.2d 787, 791 (5th Cir. 1986); Matthesson v. King, 751 F.2d 1432, 1441 (5th Cir. 1985).

In order to satisfy the prejudice prong of an ineffective assistance of counsel claim in a case involving a guilty plea, a petitioner "must show that there is a reasonable probability that, but

for counsel's errors, he would not have pleaded guilty and would have insisted on going to trial." Hill v. Lockhart, 474 U.S. 52, 59 (1985); accord James v. Cain, 56 F.3d 662, 667 (5th Cir. 1995).

Petitioner's first claim is that the prosecutor infringed on petitioner's right to the effective assistance of counsel by instructing Claudia Buras not to inform petitioner or his counsel that she had met with the prosecutor.  As an initial matter, the Court notes that petitioner presented no evidence that this in fact occurred.  For that reason alone, he has failed to meet his burden of proof, and this claim should therefore be denied.  However, even if the Court were to assume that it did occur, petitioner would be entitled to federal habeas relief only if there was a violation of clearly established federal law, as determined by the Supreme Court of the United States.  Here, he has identified no Supreme Court precedent holding that such actions by a prosecutor violate a defendant's right to counsel, and the undersigned is aware of no such precedent.[28]  Therefore, this claim should be denied.

Petitioner next argues that his counsel was ineffective for failing to obtain state funds to hire expert witnesses to independently examine and refute the state's evidence.  However, it must be remembered that an indigent defendant does not have an automatic right to expert assistance "upon demand," and "[a]n indigent defendant requesting non-psychiatric experts must demonstrate something more than a mere possibility of assistance from a requested expert."  Yohey v. Collins, 985 F.2d 222, 227 (5th Cir. 1993).  Moreover, counsel's decisions concerning whether to pursue the assistance of such experts "falls within the realm of trial strategy.  Given the almost

---

[28] As a general rule, of course, both the prosecution and the defense have an equal right to interview witnesses, see, e.g., United States v. Soape, 169 F.3d 257, 270 (5th Cir. 1999), and the prosecution may not make a witness unavailable and thereby prevent a defendant from interviewing the witness and determining whether he will subpoena and call the witness in his defense, see, e.g., United States v. Henao, 652 F.2d 591, 592 (5th Cir. 1991).  Petitioner does not allege that the prosecutor's actions rose to that level.

infinite variety of possible trial techniques and tactics available to counsel, this Circuit is careful not to second guess legitimate strategic choices.  Great deference is given to counsel, strongly presuming that counsel has exercised reasonable professional judgment."  Id. at 228 (quotation marks and brackets omitted).  Here, counsel could well have deemed the procurement of such experts to be an exercise in futility given the considerable evidence of petitioner's guilt, and petitioner has offered nothing whatsoever in support of his sheer speculation that such experts might in fact have benefited the defense or changed his decision to plead guilty.  In light of the fact that petitioner failed to produce any concrete evidence on these points, there is no basis for this federal court to conclude that the denial of this claim by the state courts was in any way contrary to, or involved an unreasonable application of, clearly established federal law.  Therefore, this claim should also be denied by this Court.

    With respect to petitioner's claim that counsel was ineffective for failing to subpoena witnesses to testify at the suppression hearing, it must be noted that such claims are disfavored "because the presentation of witnesses is generally a matter of trial strategy and speculation about what witnesses would have said on the stand is too uncertain."  Woodfox v. Cain, 609 F.3d 774, 808 (5th Cir. 2010).  The Fifth Circuit has explained:

> For this reason, we require petitioners making claims of ineffective assistance based on counsel's failure to call a witness to demonstrate prejudice by naming the witness, demonstrating that the witness was available to testify and would have done so, setting out the content of the witness's proposed testimony, and showing that the testimony would have been favorable to a particular defense.  This requirement applies to both uncalled lay and expert witnesses.

Id. (citations, quotation marks, and brackets omitted); accord Day v. Quarterman, 566 F.3d 527, 538 (5th Cir. 2009) ("[T]o prevail on an ineffective assistance claim based on counsel's failure to call a witness, the petitioner must name the witness, demonstrate that the witness was available to

testify and would have done so, set out the content of the witness's proposed testimony, and show that the testimony would have been favorable to a particular defense.").

Here, petitioner failed to provide the required affidavits or any other evidence demonstrating that any proposed witness would in fact have testified in a manner beneficial to the defense.  Therefore, he has clearly failed to meet his burden with respect to this claim, and so this claim must likewise be denied.  See, e.g., United States v. Cockrell, 720 F.2d 1423, 1427 (5th Cir. 1983) (courts view "with great caution claims of ineffective assistance of counsel when the only evidence of a missing witness's testimony is from the defendant"); Buniff v. Cain, Civ. Action No. 07-1779, 2011 WL 2669277, at *3 (E.D. La. July 7, 2011); Anthony v. Cain, Civ. Action No. 07-3223, 2009 WL 3564827, at *8 (E.D. La. Oct. 29, 2009) ("This Court may not speculate as to how such witnesses would have testified; rather, a petitioner must come forward with evidence, such as affidavits from the uncalled witnesses, on that issue."); Combs v. United States, Nos. 3:08-CV-0032 and 3:03-CR-0188, 2009 WL 2151844, at *10 (N.D. Tex. July 10, 2009) ("Unless the movant provides the court with affidavits, or similar matter, from the alleged favorable witnesses suggesting what they would have testified to, claims of ineffective assistance of counsel fail for lack of prejudice."); Harris v. Director, TDCJ-CID, No. 6:06cv490, 2009 WL 1421171, at *7 (E.D. Tex. May 20, 2009) ("Failure to produce an affidavit (or similar evidentiary support) from the uncalled witness is fatal to the claim of ineffective assistance.").

Lastly, petitioner argues that his counsel was ineffective for abandoning the motion to suppress the identification.  Defense counsel filed a motion to suppress the identification; however, that motion did not specify the identification being challenged or argue any specific basis for

suppression.[29]   At a motion hearing held on April 17, 2009, defense counsel stated:  "I'm not too sure that is going to come into play; but we will keep it open for the time being."[30]  Defense counsel did not further pursue the motion, and, as noted, petitioner elected to plead guilty on September 28, 2009.

Petitioner now specifies that the identification in question was the one made by Beth Smith. Smith told officers that she knew a person named Eric Buras who had previously met the victim. An officer later brought her a picture of petitioner, and she identified him as the person she had mentioned.[31]  However, Smith did not identify petitioner as the perpetrator, and, in fact, she could not have done so in that she witnessed neither the victim leaving Alabama with the perpetrator nor the crime in Louisiana.  Therefore, her identification of the person in the photograph was not evidence that petitioner was in fact the person who left Alabama with the victim or committed the crime; rather, it simply afforded the officers a basis for focusing on petitioner as a *potential suspect* for the purposes of further investigation.  Petitioner does not explain, and this Court cannot infer from his argument, how the officer's action in having Smith identify a photograph of petitioner in this manner or for this limited purpose violated petitioner's constitutional rights.  Petitioner has

---

[29] The motion, in its entirety, read:

> NOW INTO COURT, through undersigned counsel comes defendant, who respectfully represents:
>
> 1.
> An identification was improperly conducted in connection with the charges brought against defendant.
>
> 2.
> Said identification was improper and unconstitutional.
>
> WHEREFORE, defendant requests that said identification be suppressed.

State Rec., Vol. 1 of 8.

[30] State Rec., Vol. 3 of 8, transcript of April 17, 2009, pp. 4-5.

[31] State Rec., Vol. 4 of 8, transcript of April 17, 2009, pp. 18-20.

therefore failed to establish that there was a legitimate, nonfrivolous basis for the motion to suppress, and, without such a showing, there is no basis for finding that counsel was ineffective for failing to pursue the motion.  See, e.g., Sones v. Hargett, 61 F.3d 410, 415 n.5 (5th Cir. 1995) ("Counsel cannot be deficient for failing to press a frivolous point.").  Therefore, this claim must be denied.

**RECOMMENDATION**

It is therefore **RECOMMENDED** that federal application for habeas corpus relief filed by Eric Joseph Buras be **DISMISSED WITH PREJUDICE**.

A party's failure to file written objections to the proposed findings, conclusions, and recommendation in a magistrate judge's report and recommendation within fourteen (14) days after being served with a copy shall bar that party, except upon grounds of plain error, from attacking on appeal the unobjected-to proposed factual findings and legal conclusions accepted by the district court, provided that the party has been served with notice that such consequences will result from a failure to object.  28 U.S.C. § 636(b)(1); Douglass v. United Services Auto. Ass'n, 79 F.3d 1415, 1430 (5th Cir. 1996) (en banc).[32]

New Orleans, Louisiana, this fifth day of May, 2016.



**SALLY SHUSHAN**
**UNITED STATES MAGISTRATE JUDGE**

---

[32] Douglass referenced the previously applicable ten-day period for the filing of objections.  Effective December 1, 2009, 28 U.S.C. § 636(b)(1) was amended to extend that period to fourteen days.